Good morning, Your Honors. May it please the Court, I'm Mark Gallin. I'm counsel for Cooper University Hospital. I would like to reserve four minutes of my time for rebuttal, if that's acceptable to the Court. That's granted, Mr. Gallin. I have to tell you, I have to dig deep into the background of my math in order to work out the ratio that is at issue here. It's sticky, but it's important. It's one of the few areas where lawyers have to do math. One of my law clerks came up with a quotation from the Fourth Circuit. It spoke about Medicare and Medicaid provisions as being, quote, among the most completely impenetrable texts within human experience. I think it's a pretty good... I think Byzantine is another word that's typically used. We would probably all agree with that. I think a Supreme Court justice may have said that. All that aside, it has been an extraordinarily fun case. Yes. Well, I'm pleased to pleasure the Court in that regard, and hopefully I will try to make it a little less convoluted than... Although difficult, it's obviously important. It's a million-one for your client. Each year and every year, and it's not just my client. It's basically every hospital in New York, Pennsylvania. This is a nationally watched case. Let me ask you just, beside the year 2000, which is at issue here, is it an ongoing issue? Does it affect other years? It affects other years, and it affects every Medicare provider in the state and in many, many states. And not Medicare, it's Medicaid, isn't it? No, no, Medicare. Medicare. This is the Medicare disproportionate share adjustment. But the Court is understandable in lapsing into Medicaid because the two are pretty heavily interrelated in this case. That's going to be one of the questions. Right. So I'd like to try to cut to the chase here, if I can, realizing that time is short and that we have a very complex body of material to deal with. I'd like to ask you just a preliminary question, and it should be just for clarification. And that is, the District Court determined that this provision of 1396A is ambiguous. 1395WWD5. I'm sorry, that's right. You do not maintain, however, that it's an ambiguous provision. Let me move things along here, and that's part of cutting to the chase. I think, you know, for the sake of my own credibility and because it's fairly obvious, this provision is not clear one way or the other. We've marshaled arguments to say that it could be. Is that the equivalence of ambiguity? Yes, I think that. Ambiguity is that there's not a clear and unmistakable meaning. Isn't that a shift in the position you've taken here before? I think that's where the case ends up because each side is arguing that. That wasn't my question. Yeah. Have I missed something, or is that a change in footing? I think it's a slight change in footing, and I think just as the government marshals a number of arguments as to why its language is supportable, we've marshaled arguments on the other side. I think Judge Simandl came down squarely in the middle and said, this is ambiguous, how can it not be? First of all, the language is impenetrable. Second of all, different courts have viewed this different ways. Judge Oberdorfer, a very respected, very learned judge in D.C., who read this language, is plainly saying what we say. Which language do you say? What are we talking about? Are we talking about eligible for medical assistance? Is that the language? Well, we're talking about that language resides within a larger, longer phrase. You're talking about W, E, whatever. Well, let's call it Clause 2. Which language? Tell us specifically which language you think is impenetrable. Okay. The language at issue is the fraction expressed as a percentage, the numerator of which is hospitals' patient days for such period, which consists of patients who for such days were eligible for medical assistance under a state plan approved under Title 19. So the concept is days, is a mixture of days and patients, and then there's a reference to eligibility under a state plan. Are we looking for the definition of medical assistance? And where do we go for the definition? And isn't that at bottom the dispute here? Do we go to Title 19 or do we go to Title 9? Well, it's Title 18. One goes to Title 18 because that's where the statute is. It resides in Title 18. The statute's in Title 18. Right. So it doesn't really, or does it, make sense? You're arguing it makes sense, that it doesn't make sense. Doesn't it make sense to look to Title 19 for the definition of medical assistance since the statutory section, Title 18, specifically mentions Title 19? Well, it does and it doesn't because Title 19, the definitional section that the court below relied on, that the D.C. Circuit relied on, is found in Section 1905A of the Act, and the opening statement to that definitional section is that these definitions are for purposes of this title, which is Title 19, Medicaid. The Medicaid dish provision also that the court below relied on, that the government relies on, was enacted after the provision in question. So at the time this provision was enacted, there were no Medicaid dish days. There were no Section 1115 expansion populations, and this was Congress's initial attempt in 1985 to create a Medicare dish adjustment. In the only other place in the statute we're aware of where Congress talks about Medicaid populations, specifically in Title 18, it relies on, it uses the word eligible for Medicaid, and then Title 19 in various places uses the word eligible for Medicaid, and then Title 19, which is Medicaid, the Medicaid chapter in various places, refers to medical assistance, which are the key terms, among the key terms here, as being payments made pursuant to a state plan. So Title 19, Medicaid, uses the terms medical assistance, standing alone, as having a variety of meanings depending on the context, and the meaning that was imported for use in Title 18 here came from a section that contains a warning or a prefatory statement saying it's only for use in this title, which is... What about the language, patients who were eligible for medical assistance under a state plan approved under subchapter 19 of this chapter? That's what the district court said was ambiguous. Right, that's correct, and in fact, the PRB, which is the expert body that heard the case first, said it's unambiguous, it covers our days, because literally speaking, these are patients for whom hospitals are paid exclusively with federal funds through an approved state plan, and that this program is described in the plan. But the state plan has to be approved under subchapter 19. Title 19, it was approved under Title 19. The language is not Title 19. I think it's subchapter 19. Is that right? I believe it says Title 19 of this chapter. Subchapter 19. Subchapter 19. Of this chapter. It's... There's no dispute that the New Jersey state plan, which contains this disproportionate share provision, was approved by the secretary. It's included in the appendix. It refers specifically to the charity care funding relationship, and it refers to payments being made on account of documented care to patients enrolled in that program, which is why, from the literal terminology, the board looked at this thing and said, well, why wouldn't this be covered? These days are paid for under the state plan, and the debate really boils down to whether or not medical assistance refers to Medicaid eligibility or whether it refers to services that are funded. It's disputed, though, that the charity care patients are not eligible for Medicaid. They are not eligible for Medicaid benefits, but we are positioned as they are eligible for medical assistance under a state plan, because if they go to the hospital, that's who pays for the care, and that's reflected in New Jersey's state plan. Unlike the Ohio plan, by the way, which the D.C. Circuit looked at in ADENA, these are patients who specifically are paid for in terms on a patient-by-patient basis under the state plan. So what is the relationship between the NJCCP and New Jersey's state Medicare plan? Medicaid plan. Medicaid plan. Is the NJCCP just a part of the Medicaid plan? The NJCCP is both a state program which establishes charity care, but it's also part of the Medicaid plan, in that the Medicaid payment for services under that program are under the plan. In other words, the only funding, the sole and exclusive funding for patients that hospitals treat under this program are made as Medicaid disproportionate share payments on account of those patients. And the hospitals receive what we call Medicaid light. They get a Medicaid rate discounted for these patients. And there's no dispute about that, that the PRB recognizes that, the administrator recognizes that, the district court recognizes that they're covered under this DISH provision. The question is, is that medical assistance under a state plan? And what I would really like to focus on is our third argument, which is there's enough conflict about what these confusing terms mean and what this phrase means that the secretary is entitled to deference under Chevron if the secretary has a reasonable and permissible construction of these terms. But there's then a counterpoint to that. And the counterpoint to that is the Administrative Procedure Act. And Bush v. Quayle is the case we would rely on in that respect. And basically the doctrine is that even if an interpretation can be chosen as one of several permissible interpretations or alternative permissible interpretations under Chevron, under Prompt 2, that doesn't end the inquiry. And the question becomes, even if you choose an interpretation that's grammatically permissible, are you interpreting the statute in a way that is inconsistent in application, that results in disparate treatment? Excuse me, let me go back to Judge Smith's question. Isn't it true that New Jersey's NJCCP program expressly excludes persons eligible for Medicaid? I mean, just expressly, or maybe it was Judge Bassett. It covers persons who are excluded. It covers persons whose income is below 200 percent of the federal poverty line. So it covers four people. We don't debate that these patients are not Medicaid eligible. That's the question. It's not disputed. That's not disputed. But on the other hand, New Jersey's plan says this is a form of medical assistance, and it's medical assistance for those who do not qualify for Medicaid. So the conundrum is, is it Medicaid or is medical assistance broader than Medicaid? We believe medical assistance is broader than Medicaid, but you don't have to take my word for it. The Secretary believes medical assistance is broader. Well, we're going to hear from the representative of the Secretary in just a minute. Isn't it important or significant that Congress permitted the Secretary to include these demonstration project patients in the Medicaid fraction? It's very significant. But didn't mention charity care patients? Well, that's the nub of our argument. And what Congress actually said, and it's the DRA provision, is that the Secretary's permitted to include The DRA, the Deficit Reduction Act, I'm sorry. The Deficit Reduction Act is the statute in which Congress specified that these 1115 expansion populations could be covered. And in so doing, Congress was not requiring Medicaid eligibility because the starting premise was that these folks were not eligible for Medicaid. And in approving the expansion and the Secretary's inclusion of these patients, Congress said, and this is at page 31 of the appendix contained in page 31 of the reply brief, to the extent the Secretary determines inpatient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under Title 11. In other words, what Congress was ratifying was Secretary's right to include expansion populations, even though they are not funded under Title 19. The Jersey charity patients, in fact, have always been funded under Title 19, because the dish payments are part of the state plan under Title 19. So we believe quite strongly that the Congress is actually sees it Cooper's way, because Congress in 2005 basically ratified a regulation, which included patients who were not Medicaid eligible because they were deemed to be funded. Okay. Your red light is on. Okay. And I think we gave you permission to have rebuttal. So now we'll hear from the Secretary or his or her delegate. Her delegate. May it please the Court. My name is Anthony Steinmeier. I'm from the Department of Justice, and I represent the Appalachian Secretary of HHS. If I could direct the Court's attention to the language, since it's intricate, but the D.C. Circuit in Adina said when you work your way through it, it's unambiguous. It's clear. The district court was a little different. It said it's ambiguous, but there's clear statutory support for the Secretary's view. So under Chenery or Chevron, we prevail. Yeah, but in Adina, the D.C. Circuit noted that Ohio hospitals were not reimbursed by the state for services provided through the charity care program. Okay. So isn't that a difference from New Jersey? I don't believe it is. And there, the key thing, if I may be tying my argument, to try to simplify it, let me get the words in front of you. And with respect to Judge Berry's question, on our Appalachian Supplementary Appendix, on Supplementary Appendix page 15, it has the fact sheet for the New Jersey charitable care. I'll just give you a second to find that, and then I can read it. I just want to nail ñ it's important to nail this down, and then I'll try and nail each thing. But on page 15 of the Supplementary Appendix, in the New Jersey fact sheet, it says essentially who's eligible. And in the middle of the page, it says patients are ñ I'm sorry, let me read 14 first. Fourteen is who is eligible for the hospital care payment assistance under New Jersey's program. And point two says that the people who are eligible must be to ñ are ineligible for any private or governmental-sponsored coverage, such as Medicaid. So the key thing I want to nail down from page 14, just so we know exactly what we're talking about, if you're entitled to New Jersey charitable care, you cannot be eligible for Medicaid. They're mutually ñ Everybody agrees to that. Right. We're not disputing that. I'm taking it in baby steps, but I want to nail that down. All right. Now let me take the next step, and that's the actual language of the statute. What page are you looking at? I'm looking at page 52 of the Joint Appendix, but it's in Mr. Gallant's brief. 52. Okay. And I'm going to call this the Medicare dish, rather. I could call it FV2, but let me just call it Medicare dish. It's number two at the very bottom of page 52. This is the key language in the case. This is the language that Adina said answers the case question. And the key is ñ Are you at page 50, JA52? No, I'm sorry. It's the blue brief, page 52. That's part of the Joint Appendix. I have JA52. That's it, Your Honor. Judge Berry has it. So what's ñ I do too, but what are you referring to? Okay. The very last paragraph on that page starts with Roman numeral II. No. No. That's my point. Oh, my goodness. May I approach the bench just to show you what I'm ñ Sure. Your pagination is not a JA pagination. So this is a section preceding the Joint Appendix. It is on page 52 of the brief itself. That's right. Oh, it's not the appendix, yeah. Actually, it is an appendix. It's a statutory addendum, so it's numbered consecutively. Oh, okay. Gotcha. Okay. Thank you. But the language ñ my basic point is the language is important in this, and it's this bottom two, and if everybody's found it. Okay. So in the numerator, the people that you count consists of patients who, for such days, were eligible for medical assistance under a state plan approved ñ and this says Title XIX. Judge Slobodur's version earlier said subchapter XIX of this title. I think that's the difference between the U.S. code ñ excuse me ñ and the U.S. code annotated. But there's no doubt that it means the Medicaid program. There's a different way of the two versions. Okay. So the key language is patients who, for such days, were eligible for medical assistance under a state plan approved by Title XIX. We say that means we're eligible for Medicaid assistance. And I just nailed down that that excludes the New Jersey charitable care people because they are not eligible for Medicaid. You agree with Judge Simandl's analysis. Is that correct? Yes. It's one of our alternatives. I mentioned that his analysis was a little bit different from the D.C. Circuit's, and we present them both as alternatives. The D.C. Circuit said this language, when you parse it through, is clear enough that we went on Chevron step one. You don't ever get to deference. The district court below said it's not quite that clear. We won under step two of Chevron because of deference. You still have Skidmore deference at the end of the day, do you not? Yes, but ñ Which do you think we should adopt? We win under either one. But let me present the argument why this language, which is very technical, is clear. What does it mean to be eligible? The only thing that's clear here, and speaking only for myself, the only thing that's clear here is that nothing is clear. Okay. Then let me just quickly shift ñ Even your firm has agreed now that it's not clear. If that's true, let me shift very quickly. Why are we entitled to deference then? And then you look at the way the secretary has interpreted this, and now, if I could just direct your attention, the easiest way to do that is also in this blue brief, if you could just look at J.A. page 49. It's the administrator's decision below. It's a little bit farther back. J.A. page 49. It's page eight of the administrator's decision. Got it. Got it. Okay. Now, you'll see the first two block quotes, it deals with the statutory language in that Medicaid disprovision that I was just quoting is the second paragraph of the first block quote. But then he said CMS has implemented it in the formal regulation, 42 CFR 412-106. Well, what does that say? And that's the next block quote on page 49. I'm sorry, Judge Barry, are you with me? It's so technical, if we don't stick to the language, I'm afraid it floats off in space. I want to stick to the language. And I know she doesn't want to float off into space. I think I'd rather do stick to the language here. Okay. So how does the secretary interpret those words, patients who were eligible for medical assistance under a state plan approved under Title 19? And the secretary, as you can see in this block quote that starts second computation, interprets that language, the number of hospital patient days of service for which patients were eligible for Medicaid. And that's exactly what I'm arguing, and it's exactly what the D.C. Circuit said was clear even without a regulation. But this nails it down. That's the way the secretary interprets it. And if that's so, it cannot include the New Jersey people because everybody, charitable people, because everybody agrees they're not eligible for Medicaid. So end of case. Now Cooper says, well, you can't rely on this. You can't give the secretary deference because the secretary has been switching positions. Okay, now there has been an interaction between Congress and the courts over these technical provisions, and there has been some change. But what about the demonstration program? Now the reason I say that's no problem for us is because there's a special statute that deals with those people. And that special statute says that people in demonstration programs ordinarily are not eligible for medical assistance under Medicaid. But as a demonstration program, the secretary could waive some of those requirements, and they would be regarded as if they were paid. Congress knew how to do it if it wished to do it. Yes, and they did it in the demonstration program. They did not do it here. But they could do it here if they wished. They could do it, and it would be a different case. But everybody agrees they have not done it for the New Jersey charitable people. So the fact that the secretary so if there is an inconsistency there, it doesn't matter because there's that special statute for the demonstration programs that says they shall be regarded as though they received medical assistance under Medicaid. Now the other inconsistency was with respect to prisoners. But if you look at that state letter, the state wrote a letter and said for Medicaid, I've been talking about Medicare, but the state letter says for Medicaid, you can't get Medicaid for your prisoners because you, the state, have an obligation under the Constitution to give medical care and food to your prisoners. So prisoners are different. You can't get Medicaid, and you can't count them in the Medicaid dish provision. Well, in the end, what the district court did get right was the fact, everybody also agrees that for purposes of the Medicaid dish provision, the state gets to count these charitable people. And that means when it treats Medicaid people, it gets a little bit higher, it gets more money because of this Medicaid dish provision. But the district court said that doesn't mean that they're eligible for medical assistance under the Medicaid program. It just means the rate that you pay to people who are covered by Medicaid is a little higher. And that same thing works for the Medicare. Medicare is higher if you treat Medicaid patients, but that doesn't mean Medicaid patients are Medicare patients. It just means the rate for the Medicare patients is bumped up. When you parse it all together, I'm not sure you'll come out where the D.C. Circuit said, that it all is clear in the end. But even if you just come out where the district court said it's permissible, I've showed you in the formal regulation where the secretary interpreted it as meaning eligible for Medicaid, and these people are not eligible for Medicaid. So both the district court and the D.C. Circuit in Adena reached the right result through slightly different reasoning. Thank you. I have a confession to make. In a former life, when I was a law professor, I taught law in the elderly, and I tried to teach Medicare and Medicaid, among other things. Wow. And I had no problem with my students and Medicare. But when I got to Medicaid, it was impossible. I lost the class, and I never in another year tried to teach Medicaid again. Well, neither have I, Your Honor. The statute is not clearly written. I mean, with the subsections and the other thing, it's a very difficult statute. Amen. And I would like to lead with that point, which is that the government has really put all of its eggs in one basket. And I really want to focus on what the secretary did in 2000. Well, they have two baskets. They have a language, and then they have Chevron. Right, but their basket is a two-compartment basket, which consists of Chevron Section 1 and Chevron Section 2. The government, for understandable reasons, if you cut through all the complexity, ignores the APA argument, which is how can the secretary under Chevron get deference for saying that the touchstone of the statute is Medicaid eligibility, when in 2000 and January 2000, the secretary amends half of the regulation with regard to the 1115 waivers. But the rationale for that is that we do not believe that Medicaid eligibility is required. We believe that Congress was focused to do. But you did agree. Well, you agree that under the New Jersey plan, Medicaid is excluded. Right. But the secretary in 2000 said heretofore we didn't recognize waiver populations unless the individuals would qualify for Medicaid. If the waiver people met the income standards and the 13 categories of eligibility, we won't consider them. And then the secretary had an epiphany in January of 2000 and said we got that wrong. The statute doesn't require Medicaid eligibility. The statute instead requires funding under Title 19. I'm going to read from what the secretary, first the secretary said in the proposed rule, that we recognize that we're now letting into the door waiver state folks who are not Medicaid eligible, could not qualify for Medicaid. But it doesn't matter because we're going to, from now on, consider the patient days of populations eligible for Title 19 matching payments to be treated as medical assistance. And what Congress, contrary to what Mr. Steinmeier and I have a long relationship together, we worked in the same office for 10 years, but notwithstanding that friendship, he got it wrong. He said to you that the DRA amended the statute to say these people will be treated as though they are eligible for Medicaid. That's not what Congress said. It's at page, it's the statutory addendum at page 31 of the reply brief. And at the top of that page, the actual amendment says we're going to allow these in even though they are not eligible because they receive benefits under an approved project under Title 11. So what Congress said is once the secretary treats Title 11 funding as, regards it as Title 19 funding, you can count these people. The secretary having determined in 2000 that funding through Title 19 was enough to count the days, nonetheless turned around and said we recognize, and it's in the preambles, and we discussed in the reply brief, we recognize that we are in effect discriminating against hospitals in states like New Jersey and Pennsylvania as opposed to hospitals in states like Arizona and Delaware, which operate under these waiver programs because in those states, hospitals can count anybody funded under a state plan whether or not they are Medicaid eligible. But we're not going to change our mind about these DISH patients. And suddenly you've got extreme disparate treatment among hospitals located in different states, and the secretary's own rationale for recognizing 1115s, which Congress ratified, requires recognizing Title DISH days because they, too, are funded. They've always been funded under a state plan. Congress didn't have to make it happen. It already had happened. Congress wanted to identify low-income patients. That's exactly right. Wouldn't they have wanted to include charity care patients? Absolutely, and that's our point. Congress said low-income patients, and it used proxies in Medicare supposedly to cover all low-income patients. The secretary's position is let's dump those patients out the window. Perhaps you should be marching in Washington carrying, you know, the flag of charity care patients. Well, I don't think we need to amend the statute that already provides for that, and Congress, I think, ratified that understanding in 2005 by saying if you're funded under a state plan, you can be counted. That's the import of the Deficit Reduction Act. Also, the Ninth Circuit in Portland drew the exact opposite conclusion from the D.C. Circuit in Adena. It said I give the plain and natural reading to the terms in the Medicare DISH provision, and it says if the days are funded. And Mr. Steinmeier, again, when he reads this thing, he ellipses out the opening part of the key provision. It doesn't say we're going to count patients eligible for Medicaid. It says we're going to count patient days for such period. Mr. Gallant, your red light is on. Okay. I'm sorry. I don't want to overstate my welcome. Thank you very much for the Court's indulgence. Thank you very much. Thank you both. You obviously have spent a lot of time on these complicated provisions. Thank you. Thank you, Your Honors.